## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

MELISSA NIGH,

Plaintiff,

v.

SCHOOL DISTRICT OF MELLEN,

Defendant.

OPINION & ORDER

13-cv-183-wmc

---

Melissa Nigh brings this action pursuant to the Family and Medical Leave Act, 28 U.S.C. § 2601 *et seq.*, against her former employer, the School District of Mellen, for allegedly (1) failing to restore her to the equivalent position of Principal/District Administrator after she returned from FMLA leave; (2) improperly considering her FMLA leave in initiating the non-renewal of her contract; and (3) ultimately failing to renew her contract in retaliation for her exercise of FMLA rights. Defendant moves for summary judgment on all three claims. (Dkt. #16.) For the reasons explained below, the court agrees that Nigh has failed to produce enough evidence to survive summary judgment as to the second of her claims; however, a reasonable jury could find on this record that defendant interfered with Nigh's right to be restored to her equivalent position and retaliated against her for taking FMLA leave. Accordingly, Nigh may proceed to trial on those claims.

UNDISPUTED FACTS[1]

## I. Background

In August of 2008, plaintiff Melissa Nigh began her employment for the School District of Mellen, Wisconsin ("the District"), as the Principal for Pre-Kindergarten through grade 12. When she was hired, there was the possibility that the position would eventually be consolidated into Principal/District Administrator to cut expenses. Until he retired on June 30, 2010, District Administrator James Schuchardt supervised her but gave her no performance evaluations.

In May of 2010, the District entered into a two-year contract with Nigh, making her its first combined Principal/District Administrator.[2] The contract was effective from July 1, 2010 until June 30, 2012 and was subject to a further one-year extension. Before she assumed her new duties, Nigh attended St. Mary's University to acquire her Administrator's license, which was mandatory for the new position. The District paid for her attendance.

Beginning July 1, 2010, when Nigh officially became the Principal/District Administrator, she was subject to the supervision and control of the Mellen School District Board of Education ("the Board"), which was then comprised of the following seven elected members: Vicky Ellias (who also served as president), Anthony Huber, Lesley Sederholm, Nicki Lazorik, Ronnie Rossberger, Wendy Koosman and Becky Bergey.[3] The Board assigned Nigh her duties and responsibilities, which included: (1) supervising staff, staff

---

[1] For purposes of summary judgment, the court finds the following facts to be material and undisputed except as otherwise noted.

[2] The parties use the terms "District Administrator" and "Superintendent" synonymously throughout their filings, and so the court will do so as well.

[3] From April of 2011 to April of 2012, the school board was comprised of Sederholm (president), Lazorik, Rossberger, Jeff Ehrhardt, Koosman, Huber, and Bergey. From April of 2012 until October 24, 2012, the school board was comprised of Sederholm (president), Lazorik, Rossberger, Ehrhardt, Stacy Thewis, Bergey and Peter Jokinen.

evaluations, staff discipline, curriculum, hiring, student discipline, finance, budgets, leave requests, data retreats, transportation, food service, 9th hour, building and grounds; (2) serving as liaison between the Board and staff, and between the Board and community; (3) leading Board committees; and (4) preparing agendas for Board and Committee meetings. The Board also had the authority to modify Nigh's duties and responsibilities as it deemed appropriate.

Nigh completed the District budget for both the 2010-2011 school year and the 2011-2012 school year. The Board approved those budgets in October 2011 and October 2012, respectively.

## II. Nigh's First Performance Evaluation

Nigh received no discipline or warnings for her work performance in 2010 or 2011. A staff performance evaluation completed in April of 2011 was mostly positive, with Nigh receiving all rankings of 3 and 4 (out of 4) from the staff members who completed the evaluations.

That same month, however, the Board presented Nigh with its own performance evaluation for the 2010-2011 school year, which was distinctly less positive. She achieved an overall rating of 1059 points out of a total of 1800, which equated to an average rating of 58.8%. Had Nigh achieved a "proficient" rating in all assessment areas, she would have scored 1350 out of 1800 points, or 75%.

Rossberger prepared a typewritten letter as part of the evaluation, highlighting several areas of concern. These included: (1) Nigh's failure to provide preliminary financial information and scenarios to the board and community in light of Wisconsin Act 10; (2)

3

her failure to meet an expectation for follow-up of others' duties and more documentation to permit more efficient tracking of effectiveness; (3) her excessive reliance on others to provide guidance; (4) poor values and the inability to hold professional staff to a high ethical standard; (5) poor execution, enforcement and follow-up of policies intended to protect students and staff; (6) an inability or unwillingness to monitor staff effectively to ensure enforcement of school policies and procedures; and (7) her failure to articulate the district's purpose and priorities to the community with respect to financial matters and the Board's positions.

In her personal evaluation, Board member Bergey rated Nigh's performance "minimal" or "basic" in 54 of 65 categories, with ratings of "proficient" in the remaining 11 categories. She also highlighted concerns of her own, including: (1) Nigh's failure to follow up on Board recommendations concerning strategies to increase community presence during strategic planning meetings; (2) failure to take on a leadership role and minimal evidence of "self-directed" leadership; (3) difficulties working under the Board and satisfying staff direction; and (4) irritation and uncommunicativeness when disagreeing with the Board.

Board member Lazorik's personal evaluation rated Nigh's performance as "minimal" in 5 categories, "basic" in 43 categories, "between basic and proficient" in 7 categories, and "proficient" in 11 categories. She also noted her own concerns with Nigh's performance, including: (1) selectiveness in choosing information to research and present to the Board; (2) failure to demonstrate that each Board member's statement was equally important to others'; and (3) failure to provide detailed and informative administrative reports to the Board.

4

Disappointed in her evaluation, Nigh provided a written rebuttal to some of the negative commentary.

## III. The November 2, 2011 Meeting

In November of 2011, the Financial Manager for the District, Joe Andrashie, resigned. He had been hired in 2006 and had received excellent performance reviews from all the Superintendents and Administrators before Nigh, but according to Jeff Ehrhardt, a former District Superintendent, there had always been issues with Andrashie -- namely, that he had not reconciled bank accounts for several years. The parties dispute whether the Board informed Nigh that they had concerns about Andrashie's performance before Andrashie resigned.

At a special Board meeting convened on November 2, 2011, Nigh presented a memorandum to the Board with two possible scenarios she asked the members to consider. (*See* Peter Reinhardt Aff. Dep. Ex. 14 (dkt. #44-23).) The first scenario involved the hiring of a business manager, who would take on both the duties of the current financial manager and "budget forecasting for the future." This business manager would also assume "more financial responsibility" and take "more initiative on other items, such as overseeing grants, food service, and building and grounds." (*See id.* at 1.) The second scenario provided for the hiring of: (1) a bookkeeper, who in Nigh's words would "have to be very, very good with Skyward," administrative software designed for K-12 school districts; (2) a superintendent who would work one to two days per week on budgetary implications, personnel handbooks, budget forecasting and staff discipline; and (3) an Assistant District Administrator/Principal. (*See id.* at 1-2.)

Nigh recommended hiring a full-time financial manager with a business administrator license, but the Board ultimately approved the hire of a full-time bookkeeper and directed Nigh to post the position as a limited-term position for the remainder of the school year.   On November 28, 2011, the District hired Jane Matthias; she had no background with the Skyward program and had to be trained in that capacity.

By this time, Nigh had begun to find it challenging to find enough time to complete all the tasks associated with her position, as indicated by the bullet points she prepared for a Board meeting on December 7, 2011.   (*See* Peter Reinhardt Aff. Dep. Ex. 84 (dkt. #72).) Around this same time, an unspecified incident occurred involving Carol Popovich, an administrative assistant, and Laurie Neibauer, a staff member.   Nigh called a meeting with the two individuals, and Popovich eventually walked out because she felt that Nigh had reprimanded her in front of a fellow employee.   The parties dispute whether the working relationship between Nigh and Popovich deteriorated after that incident.

## IV. Nigh's Second Performance Evaluation

Board members completed Nigh's next performance evaluations between late October and December 14, 2011.   The Board used a different evaluation tool to conduct this evaluation; under the new rubric, Nigh received 621 out of 1148 points, which translated to a percentage of 58%.   Bergey again prepared a summary of board members' observations and concerns; it noted that "Melissa's strength is predominately in the area of the Principal responsibilities portion of the position.   Melissa shows competence and enthusiasm in the area of Curriculum Planning and Development."

Bergey also wrote that the most prominent themes or areas of concern arose in the areas of Organization, Finance, and Physical Plant Management; Board Relations; and Policy and Governance.  Her summary went on to list the "[c]ollective majority critiques relating to this year's three lowest scoring categories."  (Peter Reinhardt Aff. Dep. Ex. 10 (dkt. #44-21) LM01207.)  In the Organization, Finance, and Physical Plant Management, those critiques included "weak/non-existent leadership," "lack of initiative," "neglectful and unaware of failures and chaos in the financial area," and "ongoing Policy violations including credit card misuses."  (*Id.*)  In the Board Relations area, Bergey included critiques like "Melissa's performance has weakened in the area of District Administrator," "Lack of regular and necessary updates to the Board," "Board must request/solicit information; lack of Administrator being primary professional advisor to the Board," "Information withheld from the Board," and "Melissa's loyalty to the Board is in question."  (*Id.* at LM01208.)  Finally, in the Policy and Governance area, concerns included "Neglect of policies," "Lack of Policy enforcement," "Lack of generation of Guidelines," "Lack of defining expectations and responsibilities to staff," and "Lack of development of procedures for working with the Board and Staff."  (*Id.*)  Nigh points out, however, that she received various *positive* comments from certain Board members in a number of these areas.

As part of this evaluation, Nigh received a detailed set of written expectations for her future performance.  They included the following:

- "Melissa will ask for help when she needs it."

- "Melissa will prepare a **thorough, monthly written report** that will discuss how she is working toward and providing evidence for at least a Proficient level of Understanding in each of the nine categories of the Evaluation tool."

- "Melissa will enforce all policies and complete Guidelines in a timely manner."

- "Melissa will improve communication with the Board by uniformly providing each Board Member a weekly District Administrator report which provides the highlights/concerns of the District over the past week."

- "Melissa will attend all PAC meetings (except when urgent/emergent extenuating circumstances arise) and include PAC meeting information in her monthly report."

(*See id.* at LM01208 (emphasis in original).)

Defendant contends that, by this time, the majority of the board members had serious concerns about Nigh's ability to perform her job, although there is a dispute as to whether they believed she could not continue in her current position at the time. (*See* Pl.'s Resp. DPFOF (dkt. #74) ¶ 38.)   When the Board members completed this second evaluation, they did not yet know of Nigh's health issues.

## V. Nigh's Illness and Return to Work

The Board planned to present Nigh with her evaluation at its December 21, 2011, meeting, but Nigh was absent.  At the beginning of December, she had begun experiencing abdominal pain and severe vomiting and was unable to eat.  Her symptoms had become "unbearable" by December 13, 2011.  Nigh used sick days or sick leave on December 13th, 15th, 16th, 20th, 21st, 22nd and 23rd.

Nigh contacted then Board President Lesley Sederholm just before the December 21st meeting and advised her that she was ill and would not be attending.  During the call, Nigh "sensed" Sederholm did not believe she was actually ill.  Nigh also missed other Board meetings due to illness.

On December 23, 2011, Nigh communicated to the Board that she was scheduled to have gallbladder surgery on December 30, 2011, in Duluth, Minnesota.  She sent a second e-mail on December 28, 2011, updating the Board and staff on her upcoming surgery and her plan to return to work the following Tuesday.  Nigh had the surgery as scheduled and returned to work on January 3, 2012.  That same day, Bergey and Rossberger presented her with a summary of the Board's performance evaluation, including the list of expectations.  Neither Bergey nor Rossberger called ahead to inform Nigh they were coming to her office with the evaluation.

From January of 2012 onward, Nigh complied with most of the expectations on the list.  She prepared and presented her monthly District Administrator reports, as well as separate reports detailing how she was working toward proficiency in each of the nine categories of the evaluation tool.  She prepared weekly District Administrator reports and provided them to the Board.  She attended PAC meetings and updated the Board on those meetings.  The parties dispute whether she timely completed District Guidelines.

From January 3 through January 5, 2012, Nigh worked modified days due to illness or medical appointments.  On January 6, Nigh informed the Board that she was still in a great deal of pain and requested a modified work schedule, asking to be permitted to work half-days for the next three to four weeks.  That same day, Rossberger sent an e-mail to the Board regarding Nigh and her work restrictions.

> Also, today I spoke with Melissa on the phone, prior to her sending out an e-mail to the Board.  She said she had left a message for Lesley, but she had not gotten back to her.  I informed her Lesley was out of town.  She stated she had seen her Doctor today and she had been placed on light duty.  She stated the Board would need to make a decision, because there is no language in her contract regarding a modified work day.  I

told her, personally I would need to know what her restrictions were prior to making that decision.  She stated, "that is fair," and she "understood that would be needed."  She told me there were no listed restriction[s] on her paperwork she received today and she would contact her Doctor via e-mail to get a list of restrictions if any.  She volunteered to provide the Doctor's note and a list of restrictions to the Board.  Because she needs a Board decision on this matter ASAP, I told her we would add this to the agenda for the special Board meeting set for the 11th.  She will also be completing FMLA paperwork.[4]

(*See* Oyvind Winstrom Supp. Decl. Dep. Ex. 92 (dkt. #86-13).)  On the 6th and from January 9th through 11th, Nigh worked four hours per day consistent with her doctor's instructions.

At a special meeting on January 11, 2012, the Board approved Nigh's request for a modified schedule.  On January 12th, Nigh worked only six hours, and on January 13th, she worked only four hours, both per her doctor's instructions.  Nigh did not work the entire week of January 23 through January 27, because she was in Marshfield for medical testing.  Because she was going to be absent from the Board's meeting on January 23, Nigh prepared her Administrator notes and comments ahead of time.  Nigh continued to update the Board on her health, via e-mail, throughout January of 2012.

## VI. Automatic Contract Rollover

At least by January 17, 2012, Nigh believed that non-renewal of her contract was a possibility, based on the way Board members had begun to treat her.[5]  She wrote in an e-mail on that date that "I believe my Board is going to non-renew my contract. . . . I have

---

[4] Defendant does not dispute the contents of the e-mail, but points out that Nigh later testified that the reference to the FMLA was incorrect, "because at that time I was just on light duty and I didn't need to file FMLA."  (Nigh Dep. (dkt. #30) 117:14-19.)

[5] In her deposition, Nigh said she believed the difference in treatment began in "early December."  Later in the deposition, she linked the advent of the Board's hostility to her call with Sederholm, which took place just before the December 21 meeting.

never been put in a situation like this with my job performance and I am really struggling with it." (*See* Peter Reinhardt Aff. Dep. Ex. 93 (dkt. #44-46).)   Around that time, she requested a letter of recommendation from Board member Ehrhardt, which he provided; Nigh had no input into the letter's contents.  (*See id.* at Dep. Ex. 128 (dkt. #44-59).)   After highlighting some of her positive traits as Principal, the letter also stated that:  "Mrs. Nigh is a highly skilled administrator.   Consider this letter the highest of possible recommendations."   Ehrhardt has been asked to provide such letters in the past and has, on at least one occasion, declined to provide a letter of reference when he believed the requester was not a good teacher.

On January 23, 2012, in a closed session, the Board discussed Nigh's job performance and decided to issue a letter ending the automatic rollover of her contract.   On January 24th, the District's counsel prepared a letter notifying Nigh that the automatic rollover of her contract had been canceled.   It stated in part:

> The decision to not rollover or extend a contract gives you a year, between now and January, 2013, to convince the Board of Education that you are worthy of renewal.   However, I would be remiss if I did not advise you that members of the Board are very concerned about your performance – to the extent that it seriously considered initiating contract termination proceedings at this time.
>
> The Board members feel that you have disregarded written Board policy as well as Board directives on a number of occasions and in a number of decisions.   For example, despite concerns about the Financial Manager's performance expressed by Board members, they feel you failed to adequately supervise the Financial Manager.   Further, when he ultimately resigned, Board members believe you improperly figured his separation pay to the District's (significant) disadvantage.   Board members are upset that you did not charge teachers and other employees who were absent (due to head lice) to take sick leave as is required under District policy.   Board members have questions

11

and significant concerns regarding you (and others) improperly purchasing discounted and tax-free food from the District. Finally, you sent a teacher to an Athletic Director's Conference on grant monies inappropriately.

In other words, there are serious concerns which make it likely that the nonrenewal process will be initiated in January, 2013.

(*See* Peter Reinhardt Aff. Dep. Ex. 13 (dkt. #44-22).)  The Board approved the letter at its meeting on January 26, 2012, and Rossberger hand-delivered it to Nigh the morning of January 28, 2012.  Rossberger later prepared an e-mail to the Board that described the letter's delivery and Nigh's reaction.  According to that e-mail, Rossberger was careful to distinguish between "ending the automatic rollover language" and an actual "non-renewal." (*See* PPFOF (dkt. #43) ¶ 70.)

## VII.   First FMLA Leave

On February 2, 2012, Nigh submitted a request for Family and Medical Leave, along with the appropriate paperwork, seeking a leave of absence from February 2nd through February 15th.  Her leave request was subsequently extended until February 22, 2012.  On February 15th, the Board voted and approved her request.  There is no dispute that Nigh had a serious health condition and was eligible for FMLA at that time.

While Nigh was on leave, there was initially no Administrator or Superintendent at the school.  Accordingly, several Board members took a more active role in the day-to-day operations of the District to address various issues that surfaced during Nigh's absence.  The Board also held numerous closed-door meetings to deal with staffing and student issues, and administrative staff and Board members periodically entered Nigh's office to search for materials and files.

12

During this time, the Board decided it would send someone to Nigh's house to retrieve her keys and cut off Nigh's access to her school e-mails.  There was no official policy requiring that employees on leave turn in their keys and give up e-mail access.  In the past, some other employees had, like Nigh, lost access while on FMLA leave, while others had not.  Board President Sederholm called Nigh to inform her of the Board's decision, and Nigh became upset and started to cry.  Sederholm understood the Board's decision was hurtful, but the District nevertheless had IT cut off Nigh's school e-mail access, and on or about February 2, it sent someone to her home to pick up her keys.

The parties dispute the motivation underlying the Board's decision to revoke Nigh's access.  The Board frames it as an attempt to help Nigh, who had previously informed the Board members that she was having a difficult time separating herself from work; Sederholm claimed that Nigh was sick, but continued coming into school after hours.  Nigh disputes these proffered reasons, and the parties do not dispute that the only time Nigh actually went to school while on leave was to watch her son's basketball game.

At some point during Nigh's medical leave, Administrative Assistant Popovich began to monitor Nigh's e-mails.[6]  The District's new bookkeeper, Jane Matthias, was aware of this practice, because Popovich shared the contents of e-mails with her.  One of the e-mails purported to be from American Airlines, dated January 23, 2012, and indicated that Nigh had an airline ticket to Albuquerque, New Mexico.  (*See* Oyvind Wistrom Supp. Decl. Dep. Ex. 119 (dkt. #86-16).)  Matthias recalls Popovich saying that Nigh had an airline ticket and Interim Superintendent Cox commenting that, if Nigh was "so sick, why was she going

---

[6] When this monitoring started is not clear from the parties' submissions, but given that Cox was not hired until Nigh's second period of leave, it is possible that the monitoring did not begin until then. Regardless, this can be clarified by the parties at trial.

on a trip?"  On a hard copy of the e-mail, Board member Rossberger wrote: "Can we see if this was a scheduled vacation.  Was it during leave.  Can we get copy of attachment."  (*See id.*)  The original message turned out to be nothing more than a junk e-mail -- Nigh did not purchase an airline ticket and has never been to Albuquerque.

## VIII.   February 23, 2012 Reprimand

Nigh returned from leave on February 22, 2012, as scheduled.  The next day, the Board issued Nigh a written reprimand with fourteen, separate bullet points detailing alleged policy violations and misconduct.  (*See* Oyvind Wistrom Decl. Ex. 20 (dkt. #25-20).)   The parties dispute when the Board began drafting the reprimand, although defendant contends that the Board discussed issuing the reprimand as early as December of 2011.  There are no minutes from February of 2012 reflecting formal action by the Board with respect to the reprimand, although Board member Ehrhardt testified that the Board reviewed and approved all written warnings that it gave to Nigh.

Each of the fourteen bullet points described a separate "violation."  The parties dispute whether Nigh was actually at fault for any of the alleged violations.  Nigh maintains that the reprimand was unjustified.  (*See* Pl.'s PFOF (dkt. #43) ¶¶ 112-234.)   The list included:

- Providing false information to the Board regarding the status of a support staff member with ongoing policy and handbook violations.

- Authorizing law enforcement to use the school for "active shooter" training without notifying all staff.

- Granting paid time off and reimbursement, in violation of policy and without authority, when staff members contracted lice.

- Using Title II(A) funds inappropriately to pay for the Athletic Director to attend WIAA training.

- Failing to protect the District and its students upon reports of a support staff member's abuse of students.

- Violating chain of command by contacting the Board Clerk instead of the Vice President regarding teacher evaluations.

- Failing to complete or have someone complete a teacher evaluation for the Special Education Director.

- Informing two staff members that the Board would be terminating them or reducing their positions, without the authority to provide such information.

- Failing to monitor a staff member overseeing the "9th Hour" program, resulting in staffing problems and student injuries.

- Ordering food through tax-free accounts and permitting another staff member to do so as well.

-  Failing to maintain documents related to a directive pertaining to liquidated damages against the existing Financial Manager.

- Failing to manage and control the use of District credit cards.

- Failing to enforce sign-out policy.

- Failing to report to law enforcement allegations of two physical assaults and false imprisonment that took place between a support staff member and children.

That same day, Nigh also received a revised list of expectations, including that she: ask for help from the Board when needed; provide the Board with planned weekly schedules; prepare thorough monthly written reports; enforce policies and complete guidelines in a timely manner; improve communications with the Board via weekly reports; and attend all PAC meetings.  Nigh complied with most of these expectations, although defendants again contend that she did not complete District Guidelines in a timely fashion.

On June 6, 2012, Nigh submitted a written rebuttal to the issues raised by the reprimand.  The Board issued a written "sur-rebuttal" on August 22, 2012.

## IX. Second FMLA Leave

On or about March 4, 2012, Nigh submitted a request for a second leave of absence of eight weeks.  The request indicated that her medical team "would continue to evaluate her health status as time moves on" and would adjust her return date accordingly.  The Board approved that request as well.  There is no dispute that Nigh continued to have a serious health condition and was eligible for FMLA leave.

On March 6, 2012, the Board voted to approve the hire of a part-time Interim Superintendent, to cover the period until Nigh returned to work.  The next day, the Board hired Michael Cox as Interim Superintendent, with an initial contract covering the period of March 7, 2012 until May 2, 2012.  The Board neither consulted Nigh nor sought her input before making this decision.  Throughout Nigh's absence, Cox worked four days per week, performing both Superintendent and Principal duties.  Because there was no other office available in the administrative area, Cox used Nigh's vacant office.

During her second leave, Nigh's relationship with the Board continued to deteriorate. While at her son's basketball games, for example, she observed that Board members Hubert and Lazorik were ignoring her, although their motivations are in dispute.  Furthermore, at one game, Ehrhardt was sitting in front of Nigh but told her he could not talk to her "because there are eyes watching."  Nigh's presence at the basketball games also apparently raised doubts in the minds of some Board members as to her condition: for example, Matthias recalls Lazorik stating she thought Nigh was not really ill and was actually "faking it," though her specific wordking is in dispute[7]  During a finance meeting, Lazorik also commented that she thought "the whole thing was just odd – that Melissa was going on FMLA."  Cox also questioned Nigh's entitlement to leave, stating, for example, that he could not understand how Nigh was collecting long-term disability "without a long-term illness."[8]

On or about April 17, 2012, Nigh notified Matthias in the administrative offices that she would be returning to work on May 1, 2012.  After learning of Nigh's planned return date, Cox sent an e-mail to the Board that read:

> I don't like surprises and know you don't want to come tonight and get a big one!  Here it is: Melissa Nigh, this afternoon, notified us she plans on returning to work on May 1, 2012.  We can talk about what you want to do in closed session tonight.

(Peter Reinhardt Aff. Dep. Ex. 29 (dkt. #44-29).)  Accordingly, at its April 28th meeting, the Board discussed the situation and voted to approve Cox's continued employment on a part-time basis until June 30, 2012.

---

[7] Plaintiff's unopposed motion to correct this proposed finding of fact by adding the word "faking" (dkt. #87) is GRANTED.
[8] Nigh had applied for long-term disability benefits on or about April 2, 2012.

On or about April 26, 2012, Nigh submitted the fitness for duty certification form that the District required for employees returning from FMLA leave.  That same day, Nigh and her attorney, Dan Cieslak, met with Cox to discuss Nigh's return to work.[9]  The meeting became vocal and heated as they sought to determine the roles that Cox and Nigh would assume upon Nigh's return.  During the meeting, Cox stated that he intended to stay in Nigh's office and that she would need to find another office.  He also advised Nigh to consider taking a one-year contract as a Principal and then seeking a different position elsewhere, to avoid a non-renewal on her record.[10]  Nigh claims that Cox also said that "the Board requested he talk to Ms. Nigh about being paid through June 30, and that she could 'just stay home' and be 'done.'"  Defendant disputes that Cox made this statement, but concedes that Cox was "openly hostile" toward both Cieslak and Nigh.  (*See* Def.'s Resp. PPFOF (dkt. #80) ¶ 288.)

Following the meeting, Nigh e-mailed Cox requesting an updated job description setting forth her revised duties, to avoid confusion concerning their respective roles.  Cox responded via e-mail and provided his understanding of their respective duties, which included Cox assuming responsibility for finance, building and grounds, food service, the 21st Century grant and staff evaluations.  Cox also indicated he would be vacating her office.  Nigh responded, "This sounds like it may be fine.  However, due to my circumstances, I will not be meeting with the Board unless my attorney is present either by

---

[9] The parties dispute whether Cox was authorized to speak on behalf of the Board during this meeting.  Nigh alleges that Cox stated he was, while defendant points to the testimony of various Board members indicating Cox had no such authorization.

[10] It is also undisputed that Cox informed Sederholm that he had told Nigh it would be best if she looked for different employment, and that Sederholm took no action in response to this disclosure.

phone or in person." On April 30, 2012, Cox prepared and sent an e-mail informing staff of this division of responsibilities.

## X. Nigh's Return to Work

On May 1, 2012, Nigh returned to work in the position of Principal/District Administrator, with no reduction in her pay or benefits or change in her title. By this time, Cox had vacated her office and set up a new office space in the old meeting/break room.

On May 2, 2012, the Board met to discuss the roles Cox and Nigh would assume following Nigh's return from leave. Cieslak had originally been scheduled to appear by telephone on Nigh's behalf, but he was later informed that he could not attend unless he could appear in person, as the District's attorney was appearing by phone. Ultimately, the Board formally charged Cox with overseeing finance, building and grounds, food service, staff evaluations and the 21st Century grant. Nigh was deemed responsible for curriculum, response to intervention, board policy guidelines, student issues and student discipline. Cox and Nigh were to work collaboratively with one another and were to report directly to the Board. Cox's schedule going forward was reduced to either two or three days per week.[11]

The Board's decision altered Nigh's duties and responsibilities going forward. Essentially, although she remained responsible for all Principal duties, she had lost authority over Superintendent duties. In addition, she was no longer involved in preparing agendas for Board meetings and Committee meetings, nor was her input sought. The parties dispute whether she continued to serve as the Board's liaison to staff and the community.

Nigh's involvement in certain areas and activities also changed somewhat after her leave. For example, Popovich did not know Nigh was supposed to be invited to at least two

---

[11] During the 2012-13 school year, Cox's schedule was further reduced to two days per week.

meetings and failed to notify her.  Nigh found out about the first meeting before it occurred and was able to attend despite the lack of notification, but she did not hear about the second meeting and did not attend.  Nigh also did not participate in the hiring of a business education teacher and a special education/health aide, and her name was removed from letters of intent to staff and from lunch bills.  She no longer received copies of agendas for meetings, although defendant argues that they were always accessible to her via the website or public postings in the school.  She was also asked to leave any closed-session meetings involving personnel or staffing issues.

On May 3, 2012, Cox sent an e-mail to the Board regarding the budget.  (*See* Peter Reinhardt Aff. Dep. Ex. 54 (dkt. #47).)  In part, the e-mail stated: "With Melissa returning, it has put a real twist in our effort to balance this year's budget."  (*Id.*)

On May 30, 2012, the Board prepared a letter setting forth its expectations for Nigh.  The letter indicated that in the Board's view, Nigh continued to work as the District Administrator/Principal and would continue to be evaluated in both capacities.  It also instructed Nigh to "work collaboratively" with Cox:

> For a finite amount of time you have an invaluable opportunity to work with a highly experienced Interim Administrator to meet the needs of the District and to move toward professional competence.  Only you can take the initiative to utilize this resource.  When the Interim Administrator's time with the District is concluded, you will return to being the sole District Administrator/Principal.  Please take this time to involve yourself in all areas of the District by communicating and working with the Interim Administrator.  Talk with the Interim Administrator about your areas of weakness and ways to strengthen your performance.

(*See* Peter Reinhardt Aff. Dep. Ex. 126 (dkt. #65).)

At some point following Nigh's return, a student noticed that the sign over her office door, which had stated "Superintendent," was missing.  It is unknown what happened to the sign, but Nigh never requested that a new one be issued.  No one ever investigated the sign's disappearance.

## XI. September 19, 2012 Reprimand

On September 19, 2012, Nigh received a second written reprimand, purportedly involving several additional deficiencies in her performance.  (*See* Peter Reinhardt Aff. Dep. Ex. 32 (dkt. #44-32).)   As with the first reprimand, the parties dispute whether the reprimand accurately identifies the alleged deficiencies.  They included:

- Failing to complete Guidelines in a timely manner.

- Failing to maintain official District documents -- specifically, a Management Representation letter needed for an audit.

- Authorizing professional time off for various staff members, despite the fact that the Board had assigned authority over personnel and staff issues to Cox following Nigh's return.

- Sending an e-mail to District staff advertising a house for rent in Mellen, in violation of Mellen Policy precluding employees from having a financial interest in an activity that conflicts with their duties in the school system.

The Board also provided Nigh with updated expectations that criticized her for failing to inform the Board of her struggles and instructed her to report on her progress in all evaluation categories, including those over which Cox had primary authority.

On October 15, 2012, Nigh submitted a written rebuttal to the contents of the September 19, 2012 reprimand.  (*See id.* at Ex. 33 (dkt. #44-33).)  The rebuttal addresses three of the four purported violations but does not claim that the reprimand for her failure to complete Guidelines was issued inappropriately.

On September 19, 2012, the same date as the second reprimand, Nigh submitted a memorandum of resignation to the Board.  In it, Nigh indicated she was under contract to serve the District through June 30, 2013, but that she would not be seeking a renewal of her contract for the 2013-2014 year.  Sederholm acknowledged receipt of the letter, but refused to accept the resignation.  Counsel for the Board was at that time working with Nigh's attorney to agree on terms for a voluntary separation.

## XII.   Nigh's Third Performance Evaluation and Non-Renewal

On October 24, 2012, the Board voted 6-0 to send Nigh a preliminary notice that it was considering non-renewal of her individual contract pursuant to Wis. Stat. § 118.24. Nigh initially requested a formal hearing, but ultimately decided to forego it.  She did, however, request through her attorney a written breakdown of the reasons substantiating the Board's decision to issue the preliminary notice.  Attorney Robert Butler, Wisconsin Association of School Boards ("WASB") Associate Executive Director and Staff Counsel, responded via letter, including the attachments Nigh had requested "to substantiate the Mellen School Board's action."  Those attachments included the written reprimands of February 23 and September 19.  (*See generally* dkt. #45.)  The letter also included what appears to be a summary document of sorts detailing Nigh's alleged "Failure to meet the District's Performance Expectations."  One of the listed failures was Nigh's "inability to

understand, implement and establish financial budgeting of the District," although budgeting was no longer Nigh's responsibility after she returned from FMLA leave. Another listed reason was Nigh's alleged failure to inform the Board why she was absent from certain Board meetings.

In December of 2012, the Board presented Nigh with her 2012-2013 performance evaluation. She received a total score of 469 out of a possible 972 points, for a total percentage score of 48%. At least one Board member, Ehrhardt, did not provide any numerical ranking for Staff Evaluation and Personnel Management, because those areas were not part of Nigh's responsibilities at the time; this resulted in a default ranking of 0/12 points. One Board member's evaluation criticized her for missing numerous Board meetings; the parties dispute whether any of these absences were related to Nigh's illness or leave. Another comment criticized her for failing to work with Cox or use him as a resource, although Cox himself apparently felt they had a good relationship after Nigh's return and that Nigh had been receptive to his mentoring. Cox also received a performance evaluation at this time and received a total score of 797 out of 972, or 82.7%.

On December 18, 2012, the Board voted 6-0 to non-renew Nigh's original contract "for the reasons that were previously provided to you," thereby ending her employment on June 30, 2013. (*See* Peter Reinhardt Aff. Dep. Ex. 47 (dkt. #44-38).) Nigh continued as Principal/District Administrator until that date without a reduction in pay or benefits.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

23

of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion. *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Id.* at 323.

## I.  Interference

Nigh first brings a claim for interference with FMLA rights pursuant to 29 U.S.C. § 2615(a)(1).  An interference claim under § 2615 requires an employee to establish that: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her

24

intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). The fifth element -- whether the District denied FMLA benefits to which Nigh was entitled -- is the only one at issue in this case.

### A. Failure to Restore to an Equivalent Position

Nigh primarily contends that the District interfered with her FMLA rights by failing to restore her to an equivalent position when she returned from leave for the second time. The FMLA entitles an eligible employee to 12 workweeks of leave during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employee who takes leave under § 2612 must be restored either to the same position held at the time leave began or to an equivalent position "with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). Failure to reinstate an employee to an equivalent position violates the FMLA's interference provision, § 2615(a)(1). *See Breneisen v. Motorola, Inc.*, 512 F.3d 972, 977 (7th Cir. 2008).

The District first contends that Nigh *was* restored to an equivalent position, necessitating dismissal of this interference claim. Under the FMLA, "[t]he test for equivalence is strict." *Id.* Its implementing regulations provide that:

> An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

29 C.F.R. § 825.215(a).

Even so, the equivalence requirement "does not extend to de minimis, intangible, or unmeasurable aspects of the job." 29 C.F.R. § 825.215(f). For example, in *Montgomery v. Maryland*, the plaintiff contended that before her leave, her duties were "truly administrative," but afterward, she was relegated to the "simplest" of clerical tasks like answering phones and typing correspondence. *Montgomery v. Maryland*, 266 F.3d 334, 341-42 (4th Cir. 2001), *aff'd on remand*, 277 F. App'x 17 (4th Cir. 2003). The Fourth Circuit rejected that argument, holding that "[t]he difference between 'truly administrative' tasks and 'answering the phone, taking messages, typing simple correspondence, and the like' is not of sufficient magnitude, especially given the equivalent pay grade, increment level, and administrative classification, to constitute an FMLA violation." *Id.* at 342. The court likewise rejected the plaintiff's loss of her own workspace as de minimis and, ultimately, affirmed the district court's dismissal of her claim. *Id.*

The District would analogize this case to *Montgomery*, pointing out that (1) Nigh's job title did not change upon her return; (2) her pay and benefits remained the same; and (3) she did not lose any opportunities for promotion. While several of Nigh's duties were reassigned upon her return -- with Cox taking over in the areas of building and grounds, finance, food service, staff evaluations and the 21st Century grant -- the District characterizes those changes to her duties as de minimis, particularly given that, as in *Montgomery*, her title, pay and other terms and conditions of employment remained the same.

While there are aspects of this case analogous to *Montgomery*, Nigh does not depend on the sort of hazy distinction between "truly administrative" and "clerical" work on which the *Montgomery* plaintiff relied. Rather, Nigh lost responsibility for, and authority over, *all*

26

finance, personnel and building and grounds matters.  In fact, the Board later reprimanded Nigh for authorizing paid time off *because* it had reassigned authority over such matters to Cox, strongly suggesting that her status had changed, even if her nominal title was the same. Additionally, she was excluded from hiring decisions; she no longer received meeting agendas; and she missed at least one committee meeting because it was no longer clear that she was invited.

These changes in her authority and responsibilities are sufficient to establish a genuine dispute of fact as to whether defendant failed to restore Nigh to an equivalent position after her leave.  *See Arrigo v. Link Stop, Inc.*, 975 F. Supp. 2d 976, 987 (W.D. Wis. 2013) ("loss of management responsibilities could be significant in itself to show that [an employee] was not returned to an equivalent job"); *Brown v. Hartt Transp. Sys., Inc.*, 725 F. Supp. 2d 210, 230 (D. Me. 2010) (genuine dispute of material fact as to equivalency of position post-leave where employee lost management authority and involvement with his former accounts was reduced).

The District also argues that even if Nigh were not restored to an equivalent position, the decision was entirely unrelated to her leave and cannot constitute an FMLA violation. Legally speaking, the District is correct that "[t]here are limitations on an employer's obligation to reinstate an employee."  *Mitchell v. Dutchmen Mfg., Inc.*, 389 F.3d 746, 748 (7th Cir. 2004).  "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."  29 C.F.R. § 825.216(a).  In *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799 (7th Cir. 2001), the Seventh Circuit explained:

> Clearly, an employee may not be fired because she took leave –
> that would be in direct violation of the statute.  *See* 29 U.S.C.
> § 2615(a)(1).   However, an employee may be fired for poor
> performance when she would have been fired for such
> performance even absent her leave.

*Id*. at 805.  Thus, once an employee has established she is entitled to the FMLA benefit she

claims, "[t]he employer may then present evidence to show that the employee would not

have been entitled to her position even if she had not taken leave."  *Id.* at 804.  Moreover, it

is then the employee's burden to "overcome the employer's assertion, as she carries the

burden of demonstrating her right to the entitlement."  *Id.*

Furthermore, even the fact that FMLA leave allows an employer to discover

performance deficiencies does not preclude the employer from basing a future adverse

action on those deficiencies.  *See, e.g.*, *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236,

1242 (11th Cir. 2010) ("[T]he [FMLA's] purpose is not implicated in the least if an

employee's absence permits her employer to discover past professional transgressions that

then lead to an adverse employment action against the employee."); *Kohls*, 259 F.3d at 806

("The fact that the leave permitted the employer to discover the problems [cannot] logically

be a bar to the employer's ability to fire the deficient employee.").

Defendant relies on this framework, arguing that Nigh would not have been entitled

to her position regardless of FMLA leave due to: (1) her deficient performance; and (2) her

"request for help" at the November 2, 2011 meeting, when she recommended hiring a

business manager.  It further contends that it was free to take adverse action against her

even if it would not have realized how poor her performance was absent her leave.  While

cases like *Kohls* and *Schaaf* would ordinarily make it difficult for Nigh to overcome the

District's defense, Nigh accurately points out that this case is different in one crucial aspect:

timing.   In both *Kohls* and *Schaaf*, the employers discovered the performance issues for which they ultimately terminated their employees *after* those employees took their FMLA leave.  *See Schaaf*, 602 F.3d at 1243 ("Here, the evidence shows that Schaaf was demoted because of managerial ineffectiveness that revealed itself in full only in her absence[.]"); *Kohls*, 259 F.3d at 806 ("[I]t is clear that the employer did not discover many of the deficiencies in Kohls' work – particularly with respect to the checkbook – until after Kohls took leave."); *see also Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 635 (7th Cir. 2009) (interference claim failed where plaintiff "offered no evidence to dispute that the investigation began, and his shortcomings were discovered, after his leave period commenced").

In contrast, here, the District was aware of Nigh's performance issues *months* before she took leave.  As early as April of 2011, the Board had identified a number of purported problems with Nigh's performance.   By December of 2011, the Board specifically recognized that Nigh was struggling to complete her Superintendent duties -- including areas like finance and physical plant management.  Nevertheless, the District did not relieve her of those duties until after she returned from her second FMLA leave in April of 2012.

In *Kohls*, the Seventh Circuit suggested that a lapse in time between discovery of deficiencies and demotion may create a genuine dispute of fact in the context of an FMLA interference claim.

> We can imagine circumstances in which the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware).

*Kohls*, 259 F.3d at 806.  These circumstances better fit the District's actions here.  The Board was well aware of Nigh's struggles in her role as District Administrator months before she took her second FMLA leave, but it did not divest her of her authority in that area until *after* that leave.  In fact, the record indicates that the decision to retain Cox was made the same day that the Board learned Nigh planned to return from leave in May, and the official vote to transfer some of her duties to Cox took place the day after she returned.  A reasonable fact finder might infer, based on that timing, that Nigh would have continued with her full complement of duties and powers as Principal/District Administrator had she not taken FMLA leave.

Additional evidence also renders summary judgment on this claim inappropriate.  For example, the District concedes that it initially hired Cox in order to accommodate Nigh's absence, *not* for reasons related to her performance or her memo of November, 2011.  This, too, might allow a reasonable jury to infer that Nigh's leave, not her performance, caused the board to assign her duties to Cox after her return.  *Cf. Breneisen*, 512 F.3d at 978 (reversing grant of summary judgment on interference claim where employee's job duties had been distributed to others during leave to accommodate his absence, rather than for some other business reason).  A reasonable trier of fact might find further grounds for such an inference given comments Lazorik concededly made about believing that Nigh was "faking" her illness, the behavior of other Board members during Nigh's second leave and Cox's derogatory remarks about Nigh's lack of long-term illness.  *See, e.g., Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 994 (7th Cir. 2010) (jury could be swayed by comments "that could suggest frustration with Goelzer's use of FMLA leave").

This is not to say that the trier of fact *will* make such an inference.  Indeed, there is ample evidence to infer that responsibilities resulting from combining the dual responsibilities of principal and district manager in one new position may have proved too much for Nigh (or anyone else), at least given the District's expectations, and that its action in hiring Cox and splitting duties was a recognition of this fact, or at least of Nigh's limitations immediately upon her return from her second FMLA leave.  But the record can also support the opposite conclusion, not only because of the suspicious timing and ambiguous comments from Board Members, but also given that the Board appeared to have stripped Nigh of her authority in several areas (rather than, for instance, hiring Cox as a subordinate to aid her in accomplishing all her tasks) and apparently never restored that authority to her.  These competing inferences are what make for a trial.  Accordingly, the District is not entitled to summary judgment on this claim.

## B.  Non-Renewal

Nigh also contends that defendants interfered with her FMLA rights by using her leave as a "motivating factor" in the decision to non-renew her contract.  Her source of legal authority is 29 C.F.R. § 825.220, which provides that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions[.]"  *See, e.g., Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125-26 (9th Cir. 2001) (consideration of absences in termination decision actionable if those absences were covered by the FMLA); *Walters v. Mayo Clinic Health Sys.-EAU Claire Hosp., Inc.*, -- F. Supp. 2d --, 2014 WL 549889, at *9 (W.D. Wis. Feb. 11, 2014) (genuine dispute

of fact on interference claim exists where plaintiff was disciplined after taking FMLA-approved leave).

Generally, the Seventh Circuit analyzes "motivating factor" claims under the rubric of retaliation, not interference. *See, e.g.*, *James v. Hyatt Regency Chi.*, 707 F.3d 775, 781 (7th Cir. 2013); *Pagel v. TIN Inc.*, 695 F.2d 622, 631 (7th Cir. 2012); *Breneisen*, 512 F.3d at 978 ("[T]he FMLA protects employees from being discriminated or retaliated against for exercising their FMLA rights. . . . For instance, if an employee takes FMLA leave, an employer cannot use it as a negative factor in hiring, promotions, or disciplinary actions.") (internal citations omitted).  Furthermore, other courts have held that claims premised on termination that occurred some amount of time *after* leave are better analyzed as retaliation claims.  *See, e.g.*, *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (district court properly confined analysis to retaliation theory where plaintiff received all leave to which he was entitled, returned to work, was reinstated and was terminated some weeks later); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006) (district court properly analyzed claim as one for retaliation, not interference, where plaintiff received leave, returned to work, and was terminated more than a month later).

This court need not rely on the above authority in precluding Nigh from pursuing a separate interference claim based on her non-renewal, however, because even if she were permitted to do so, Nigh has not produced enough evidence to survive summary judgment on that theory.  As support, Nigh points only to the letter and attachments substantiating the Board's intent to non-renew.  (*See* Peter Reinhardt Aff. Dep. Ex. 50 (dkt. #44-39).) The summary document in the attachments details a number of ostensible "[f]ailure[s] to meet the District's Performance Expectations," one of which reads:

32

> There have been Board Meetings where Ms. Melissa Nigh has
> not been present and has not communicated to the Board
> beforehand or afterward as to the reason for her absence.

(*Id.* at Dep. Ex. 51 (dkt. #45) 2-3.)  Nigh argues that this statement is an admission that defendants improperly considered her absence during FMLA as a reason to non-renew her contract.

Even if this statement alone were sufficient to support an interference claim,[12] there is no evidence that the statement refers to her absences *during leave*.  Indeed, Nigh missed board meetings not only while on FMLA leave, but also when she was ill generally.  (*See* Def.'s Resp. PPFOF (dkt. #80) ¶¶ 411-12.)  She has presented no evidence that the statement in Butler's letter refers to any of her FMLA-protected absences, rather than those absences for which she was simply ill.[13]

Nor would such an inference be reasonable on this record.  The statement in question appears under the subheading "Communication with the Board" and faults Nigh for missing meetings without communicating the reason for her absence.  (*See* Peter Reinhardt Aff. Dep. Ex. 51 (dkt. #45) 2-3.)  In contrast, the Board *was* aware of the reason for Nigh's absence during her FMLA leave -- it had, after all, approved both instances of leave.  Perhaps a reasonable jury *might* infer this statement was intended (or at least could have been construed) to include Nigh's FMLA-protected absences with some additional supporting evidence, but Nigh points to nothing else to support the inference or to build the missing link between her FMLA leave and the Board's criticisms.  The court is not required

---

[12] There is little case law on the question, although the Ninth Circuit appears to have taken an employee-friendly approach, noting that "the regulations clearly prohibit the use of FMLA-protected leave as a negative factor *at all*."  *Bachelder*, 259 F.3d at 1131 (emphasis in original).

[13] Nigh also does not argue that these other absences were protected by the FMLA.

to scour the record to "piece together appropriate arguments" on Nigh's behalf.  *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

Nigh could also conceivably argue (although she did not) that the other evidence adduced of improper motivation goes to support her interference claim.  As will be discussed below, *see* discussion *infra* Section II, Nigh has in fact presented sufficient evidence for a reasonable jury to find that the District *retaliated* against her for exercising her right to FMLA leave, and she is free to argue in that context that the summary document statement supports such an intent.   But that statement alone is *not* enough to build an entirely separate claim -- one for which she need not prove motivation, *Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005) -- premised on the same adverse employment action. Accordingly, while Nigh will be allowed to challenge her termination under the standard of retaliation, which the parties have briefed extensively and in support of which she cites significant evidence, she may not pursue a *separate* interference claim for non-renewal based only on the summary document statement.

## II. Retaliation

Finally, Nigh claims that the District retaliated against her for exercising her rights under the FMLA in violation of 29 U.S.C. §§ 2615(a)(2) and (b).  *See Kauffman*, 426 F.3d at 884 ("We have construed [§§ 2615(a)(2) and (b)] to create a cause of action for retaliation.").   Courts evaluate a claim of FMLA retaliation the same way as claims for retaliation under other employment statutes.  *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503

34

(7th Cir. 2004).  Thus, to prove retaliation, Nigh may proceed under the direct or indirect methods of proof.[14]  *Id.*

In this case, Nigh chooses to proceed under the direct method of proof only.  (*See* Pl.'s Br. Resp. (dkt. #78) 16.)  The direct method requires that Nigh "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008).  Taking FMLA leave is indisputably a statutorily protected activity.  The parties also agree that the decision to non-renew Nigh's contract in December of 2012 constitutes a materially adverse employment action.  Accordingly, the central question on summary judgment is whether Nigh has presented sufficient evidence to permit a reasonable trier of fact to conclude that her non-renewal "had a discriminatory motivation." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008) (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 721 (7th Cir. 2005)).

As a preliminary matter, the proper standard of causation remains unclear.  In *Lewis v. School District #70*, the Seventh Circuit held that a plaintiff in an FMLA retaliation case "need not prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Id.* at 741-42 (emphasis in original) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)).  However, defendant argues that the Supreme Court's recent decision in *University of Texas Southwestern Medical Center v.*

---

[14] In recent years, the Seventh Circuit has questioned the utility of continuing to separate the inquiry on summary judgment into the "direct" and "indirect" methods.  *See Coleman v. Donahoe*, 667 F.3d 835, 862-63 (7th Cir. 2012) (Wood, J., concurring) ("[I]t seems to me that the time has come to collapse all these tests into one.").  While sympathetic to this position, the court will continue to apply the separate methods as called for by existing precedent unless and until directed otherwise.

*Nassar*, 133 S. Ct. 2517 (2013), abrogates *Lewis* and raised the bar for proving causation in FMLA retaliation claims.  In *Nassar*, the Court held that to prevail on a Title VII claim of retaliation, a plaintiff must meet the "traditional principles of but-for causation," and that showing the protected activity was merely a "motivating factor" in a retaliatory action was insufficient.  *Id.* at 2533.  In defendant's view, because the framework for FMLA retaliation claims derives from the Title VII context in the first place, *see Buie*, 366 F.3d at 503, the new rule of *Nassar* applies equally to FMLA retaliation claims.

Authority on this question is scarce.  At least two districts in this circuit have continued to apply the rule of *Lewis* even post-*Nassar*.  *See, e.g.*, *Kennedy v. U.S. Postal Serv.*, No. 2:10-CV-0279-PPS-PRC, 2014 WL 1047820, at *9 (N.D. Ind. Mar. 17, 2014); *Perry v. Bath & Body Works, LLC*, -- F. Supp. 2d --, No. 2:11-CV-240-PRC, 2014 WL 308838, at *10 (N.D. Ind. Jan. 28, 2014); *Williams-Grant v. Wis. Bell, Inc.*, No. 11-C-1051, 2013 WL 5447952, at *9 (E.D. Wis. Sep. 30, 2013); *see also Keiju Pu v. Columbia Coll. Chi.*, 934 F. Supp. 2d 964, 975 (N.D. Ill. 2013) (applying rule of *Lewis* despite Supreme Court decision in *Gross v. FBL Financial Services, Incorporated*, 557 U.S. 167 (2009), which held that but-for causation was applicable in the ADEA and ADA contexts).  None of those courts cites *Nassar*, however, giving them limited persuasive value.

A few courts have considered *Nassar*'s impact in the FMLA context, but those decisions yield no consensus, with most courts -- including the Court of Appeals for the Seventh Circuit -- declining to resolve the question definitively.  *See Malin v. Hospira, Inc.*, No. 13-2433, slip op. at 18 n.3 (7th Cir. Aug. 7, 2014); *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 390 (5th Cir. 2013) ("We emphasize that we need not, and do not, decide whether *Nassar*'s analytical approach applies to FMLA-retaliation claims and, if so, whether it

requires a plaintiff to prove but-for causation."); *Smith v. Bellsouth Telecommunications, Inc.*, No. 3:12-cv-581-MW/CJK, 2014 WL 505100, at *2 n.5 (N.D. Fla. Feb. 6, 2014) ("Accordingly, this Court need not determine whether *Gross* and *Nassar* impact the analysis of FMLA retaliation claims."); *Chase v. U.S. Postal Serv.*, Civil Action No. 12-11182-DPW, 2013 WL 5948373, at *9-12 (D. Mass. Nov. 4, 2013) ("[I]rrespective of which standard is to be applied, Mr. Chase has adduced sufficient evidence to survive summary judgment on his [FMLA] retaliation claim.").

Even the courts that *do* resolve the question do not agree. *Compare Chaney v. Eberspaecher N. Am.*, 955 F. Supp. 2d 811, 813 n.1 (E.D. Mich. 2013) (stating that *Nassar*, "while informative, did not change any applicable standards" in the FMLA retaliation context), *with Housel v. Rochester Institute of Tech.*, -- F. Supp. 2d --, No. 10-CV-6222FPG, 2014 WL 1056576, at *7 (W.D.N.Y. Mar. 17, 2014) (applying *Nassar* to all retaliation claims, including FMLA claims).

Given the dearth of clear authority and the parties' lack of thorough briefing, the court declines to resolve the question here as well, finding that Nigh can survive summary judgment -- if barely -- even under the more demanding standard of but-for causation.[15] True, the decision to stop the automatic rollover of Nigh's contract in January of 2012 predated her FMLA leave. At that time, the Board had already indicated that it was "likely" to initiate the non-renewal process due to serious concerns with Nigh's performance. Were those the only facts before the court, Nigh likely could not survive summary judgment. But it was not until October, after Nigh had exercised her rights under the FMLA, that the

---

[15] The parties will be allowed to supplement their pretrial submissions to further address the question of causation should they wish.

Board formally initiated the non-renewal process. During the intervening ten months, a number of suspicious events took place that might support a finding of discriminatory animus in the view of a reasonable trier of fact.

For example, during Nigh's first leave, the Board took away her keys and cut off her e-mail access. Although the Board contends its motivations were innocent (and they might well have been), a reasonable factfinder could infer otherwise, given that: (1) Nigh made clear she found the decision hurtful; and (2) there was no policy governing building and e-mail access during leave. Additionally, the Board began to monitor Nigh's e-mails, zeroing in on a "suspicious" spam e-mail and suggesting they did not believe Nigh was legitimately on FMLA leave. The day after Nigh returned from her first leave, she received a reprimand for *fourteen* separate infractions, at least some of which were known to the Board months in advance, from which one may infer suspicious timing. While Nigh does not argue the reprimand itself was a materially adverse employment action, the Board later cited the contents of that reprimand as one of the reasons underlying its decision to initiate the non-renewal process. (*See* Peter Reinhardt Aff. Dep. Ex. 51 (dkt. #45) 1.)

Likewise, during Nigh's second period of FMLA leave, she noticed that members of the Board were ignoring her at basketball games, and Ehrhardt indicated he could not talk to her because there were "eyes watching." Defendant again argues that the Board's behavior was not motivated by discriminatory animus, pointing to Lazorik's after-the-fact explanation that she understood no one should communicate with Nigh during her leave. A reasonable jury could find this justification mere pretext given that (1) Lazorik has offered no basis for that belief; (2) it is inconsistent with the Board's behavior during Nigh's first leave, when Sederholm contacted Nigh; and (3) the record contains no contemporaneous

evidence of that belief.  Furthermore, Lazorik made statements that indicated she did not believe Nigh was actually ill and was instead "faking" her illness, which at least suggests she may have viewed Nigh with hostility for taking leave.[16]  *Cf. Goelzer*, 604 F.3d at 995-96 (oral derogatory comments regarding FMLA use could support retaliation claim).

Moreover, Cox was hostile to Nigh as she tried to plan her transition back from leave, informing her that he would be keeping her office and (crediting Nigh's account as the court must at summary judgment) that she should "just stay home" and "be done," rather than returning to work.  Finally, the Board stripped her of many of her duties immediately following her return -- and then issued a negative performance review based in part on her failure to "develop" in the areas over which she no longer had authority.

Viewing all these facts in the light most favorable to Nigh, the court concludes that a reasonable jury could certainly find that her leave was a "motivating factor" in the Board's decision to non-renew her contract.  While a closer question, the court concludes she might also convince a reasonable jury that her leave was a but-for cause of the non-renewal.  As the Board points out, there is certainly significant evidence of performance deficiencies in the record as well, and those deficiencies cannot be ignored, especially since Nigh concedes that she was struggling to complete certain aspects of her position.  But "[a] single event can have multiple but-for causes," *Malin*, No. 13-2433, slip op. at 18 n.3, and given the evidence Nigh has adduced to support her retaliation claim, a reasonable jury might find that the Board would not have non-renewed Nigh's contract but for her FMLA leave -- even

---

[16] The District seeks to dismiss these comments as irrelevant, but the cases it cites -- which hold that courts do not examine legislative bodies' motivations "when a due process claim arises from an employee's termination during a reorganization," *Campana v. City of Greenfield*, 38 F. App'x 339, 341 (7th Cir. 2002) -- are wholly inapplicable.

if, in the end, her performance deficiencies played just as great a role in the Board's decision.

Perhaps, had Nigh not taken leave, she would still have been non-renewed at the end of her contract term. The District is free to argue as much at trial, and it has ample evidence to support its argument. But it is also possible that Nigh's struggles in her District Administrator capacity would not alone have been enough to persuade the Board to terminate her employment, particularly since she continued to receive reasonably positive remarks on her performance as a principal and complied with most of the expectations given to her in her second performance evaluation. Indeed, the Board was careful to leave open the possibility of her improving and being renewed until after she took FMLA leave, at which point the door was, at least arguably, precipitously closed. In any event, Nigh has produced enough evidence to allow her to so argue. As a result, defendant's motion for summary judgment on the retaliation claim will also be denied.'

## ORDER

IT IS ORDERED that:

1) Defendant School District of Mellen's motion for summary judgment (dkt. #16) is GRANTED IN PART and DENIED IN PART consistent with the opinion above;

2) Plaintiff Melissa Nigh's motion to correct proposed finding of fact 255 (dkt. #87) is GRANTED; and

3) The parties may supplement their pretrial submissions with a brief on the proper standard of causation for analyzing Nigh's retaliation claim. Any such submission should be filed no later than October 3, 2014. There will be no response or reply.

Entered this 25th day of September, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge